*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TONY DAVID KINGSLEY,

      Defendant-Appellant.

UNPUBLISHED
February 25, 2021

Nos. 349797; 349798
Wayne Circuit Court
LC Nos. 18-007549-01-FH;
         18-007675-01-FC

Before: K. F. KELLY, P.J., and STEPHENS and CAMERON, JJ.

PER CURIAM.

In Docket No. 349797, defendant Tony David Kingsley appeals his jury trial convictions for carrying a concealed weapon ("CCW"), MCL 750.227, and resisting or obstructing a police officer, MCL 750.81d(1).[1] In Docket No. 349798, Kingsley appeals his jury trial convictions[2] for carjacking, MCL 750.529a, armed robbery, MCL 750.529, kidnapping, MCL 750.349, torture, MCL 750.85, two counts of first-degree criminal sexual conduct ("CSC-I"), MCL 750.520b, two counts of third-degree criminal sexual conduct ("CSC-III"), MCL 750.520d(1)(b), and eight counts of possession of a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b.[3] We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

---

[1] Kingsley was sentenced to concurrent prison terms of 23 months to 5 years for the CCW conviction and one to two years for the resisting or obstructing a police officer conviction, to also be served concurrent to his sentences in Docket No. 349798.

[2] In Case No. 18-007675-01-FC, Kingsley was also charged with fourth-degree arson, MCL 750.75, but was acquitted of this offense.

[3] Kingsley was sentenced to prison terms of 30 to 60 years for the carjacking, armed robbery, kidnapping, torture, and for each CSC-I conviction. Kingsley was sentenced to 7 to 15 years for each CSC-III conviction and to two years for each felony-firearm conviction. The felony-firearm

# I.  BASIC FACTS

These cases arise from the carjacking, kidnapping, torture, and sexual assault of the victim by Kingsley and his subsequent flight from the police.  One evening in August 2018, the victim attended an art event with friends in Detroit, but she drove separately from them.  After the event, the victim and her friends planned to gather at a bar located in Hamtramck.  At about 10:40 p.m., the victim drove alone to the bar and parked her vehicle.  She opened her driver's side door and reached over to her passenger seat to retrieve her bag.  When the victim turned, she found that Kingsley stood between her and the open car door, preventing her from exiting the vehicle.  Kingsley pointed a firearm at the victim and said, "Give me your wallet and your keys."  When the victim "froze" and did not immediately respond, Kingsley directed her to slide over to the passenger seat.  Kingsley demanded the victim's car keys, which she gave to him.  Kingsley started the vehicle and drove out of the parking lot.

As Kingsley drove away, the victim told  Kingsley that he could take her wallet and camera out of her bag.  In response to the victim's requests to be released, Kingsley said, "I'll let you go as soon as I get to where I'm going."  Kingsley drove on the freeway at a high rate of speed and instructed the victim to put her head down while he was driving.  Eventually, Kingsley turned off the roadway, drove across a field in a park, and parked the victim's vehicle next to a dark wooded area.  Throughout this process, Kingsley kept his firearm aimed at the victim's abdomen.

Kingsley told the victim to get out of the car.  He then grabbed the victim by her hair, pulled her into the woods, and told her to undress.  Once the victim removed her clothing, Kingsley told her to put her arms around a nearby tree.  Kingsley tied the victim's wrists together with a rope, tore the victim's skirt, and then tied the strips of fabric around the victim's wrists.  In an attempt to humanize herself and make it less likely she was hurt, the victim told Kingsley about her family and her desire to live.  The victim testified, "I was afraid I wasn't going to leave the woods."

However, Kingsley ignored the victim's attempt to elicit empathy.  Kingsley went back to the vehicle and, upon his return, the victim attempted to negotiate a sexual act in exchange for her freedom because she thought it would "be a better alternative than whatever else" could happen.  Kingsley picked up the victim's dress from the ground and tied it around her neck and mouth.  The victim felt helpless because she no longer could try to talk herself out of the situation.  Kingsley left the woods once again, and, upon returning, untied the victim's gag and the rope from around her wrists.  The victim was allowed to put her dress back on, and Kingsley unbuckled his pants.

---

convictions are concurrent with each other and are consecutive to and preceding the sentences for carjacking, armed robbery, kidnapping, torture, CSC-I, and CSC-III, respectively.  The carjacking sentence is consecutive to and preceding the sentence for Count 5, the first CSC-I conviction, while the sentence for Count 5 is consecutive to and preceding Count 6, the second CSC-I conviction.  Count 6 is concurrent with the sentences for armed robbery, kidnapping, torture, and both counts of CSC-III.  Additionally, all of Kingsley's sentences in Docket No. 349798 are concurrent with the sentences in Docket No. 349797.

In response, the victim asked, "How do I know if I do this [perform oral sex] that you'll let me go?" Kingsley stated, "I promise."

Kingsley "pushed [the victim's] head into him" and later removed his penis from her mouth and ejaculated into the woods. Kingsley told the victim to put her hands on a nearby tree, and then he digitally penetrated her vagina. Kingsley then attempted to insert his penis into the victim's vagina. Although Kingsley was unsuccessful, the victim still felt Kingsley press his penis against her inner labia. Kingsley asked the victim if she was going to report him. The victim promised Kingsley she would not report him and indicated that she "just want[ed] [her] life." Before leaving the victim in the woods, Kingsley told the victim he had her identification and that he knew where she lived, stating, "Don't make me regret this." When the victim could no longer see the headlights of her vehicle, she left the woods and proceeded to a gas station where she telephoned her friends. The victim's friends had to persuade her to call the police because she was so scared of Kingsley.

After calling the police and her friends, the victim was taken to the hospital where DNA evidence was collected. The victim's vehicle was found burned and abandoned. Security footage from local businesses near the time of the victim's kidnapping captured images of Kingsley, and the police learned Kingsley's identity from community sources. The police discovered that Kingsley stayed with a local friend and interviewed the friend's mother. When packing Kingsley's belongings, the friend's mother found the victim's driver's license and returned it to the police.

The police were actively looking for the Kingsley when he was seen walking down a Hamtramck street late one evening. Kingsley disregarded the officers' commands and fled the area. When his escape was thwarted by a locked fenced area, Kingsley tossed an object and resisted apprehension. Ultimately, the police had to use a taser to secure Kingsley and arrest him. A gun was recovered from the area where Kingsley had tossed the object.

Within three days of the assaults, the victim was shown an array of photographs and identified Kingsley as her assailant. Additionally, the DNA test results corroborated the victim's identification of Kingsley. The police investigation also revealed that Kingsley was the perpetrator of a strikingly similar sexual assault that had occurred three weeks earlier in July 2018.[4] MV, who was the victim of that assault, testified that she was with her boyfriend in a car when Kingsley opened the door, displayed a gun, beat her boyfriend, and forced him to leave. Kingsley took MV into the woods, forced her to undress, tied her to a tree, and sexually assaulted her. Kingsley advised MV that after the sexual act, he would let her go.

## II. SUFFICIENCY OF THE EVIDENCE–TORTURE

Kingsley only alleges there was insufficient evidence to sustain his conviction of torture. Specifically, Kingsley asserts that the prosecution failed to establish that he intended to cause the victim cruel or extreme mental pain or suffering, or that the mental pain or suffering she experienced was caused by the threat of imminent death. We disagree.

---

[4] Kingsley apparently pleaded guilty to felonious assault, MCL 750.82, CSC-I, and kidnapping arising from this incident.

This Court reviews a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." This Court must resolve all conflicts in the evidence in favor of the prosecution. [*People v McFarlane*, 325 Mich App 507, 513; 926 NW2d 339 (2018) (citations omitted).]

"This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of the witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (citation and quotation marks omitted). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

Torture is defined in MCL 750.85, which states, in relevant part:

(1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

(2) As used in this section:

(a) "Cruel" means brutal, inhuman, sadistic, or that which torments.

(b) "Custody or physical control" means the forcible restriction of a person's movement or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.

\* \* \*

(d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:

\* \* \*

(*iii*) The threat of imminent death.

\* \* \*

(3) Proof that a victim suffered pain is not an element of the crime under this section. [See also *People v Schaw*, 288 Mich App 231, 233-234; 791 NW2d 743 (2010), quoting MCL 750.85.]

Therefore, to establish torture, the prosecution was required to prove beyond a reasonable doubt that (1) defendant intended to cause cruel or extreme physical or mental pain and suffering, (2) defendant inflicted great bodily injury or severe mental pain or suffering, and (3) the victim was within defendant's custody and control. MCL 750.85; see also *Schaw*, 288 Mich App at 233-234.

Kingsley asserts that he never verbally threatened to kill or injure the victim and that he did not perform an assaultive act that threatened imminent death. Although Kingsley may not have *verbally* threatened to kill or injure the victim, his collective actions satisfied the statutory requirements. The victim repeatedly testified that Kingsley pointed his firearm at her abdomen as he drove her vehicle on the freeway. Once they arrived at the woods, Kingsley pulled the victim by her hair, told the victim to take off her clothes, tied her to a tree, and tied her own dress around her neck and mouth. The victim testified that she told Kingsley about her family and that she wanted to live because she "was afraid [she] wasn't going to leave the woods." In response, Kingsley did not display any empathy or release the victim despite taking her car and her purse. A reasonable jury could infer that the victim was under the threat of imminent death by virtue of Kingsley's actions.

After the assault, the victim called her friends, and her friends had to persuade her to call the police because the victim was afraid of Kingsley. Over defense counsel's objections, the victim then testified that between the time of the assault and Kingsley's arrest, she was "extremely anxious," did not sleep well or want to be alone, and was afraid that Kingsley would find her. The victim also testified that, after the assault, she continued to feel anxious, especially when "going to and from" her vehicle. The victim also did not go anywhere at night on her own and sought counseling. Further, testimony at trial disclosed the victim's intimate relationship with her boyfriend was negatively affected because of the sexual assault. Therefore, we conclude that the prosecutor presented sufficient evidence that the victim was under the threat of imminent death throughout the events leading up to her sexual assault, and that threat of imminent death caused severe mental pain and suffering to the victim.

Kingsley also asserts there was insufficient evidence demonstrating that he intended to cause the victim cruel or extreme mental pain and suffering. The record belies Kingsley's assertions. "[M]inimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *Kanaan*, 278 Mich App at 622. In this case, a jury could infer that Kingsley intended to cause extreme mental pain or suffering when he kidnapped the victim at gunpoint, drove her to a secluded area, bound her to a tree, gagged her, and sexually assaulted her. After the sexual assault, Kingsley impliedly threatened the victim by advising that he knew where she lived from her driver's license, and told the victim not to make him "regret this" before leaving her in the woods. In light of Kingsley's actions throughout the evening of the sexual assault, a jury could reasonably infer that Kingsley intended to cause the victim extreme mental pain and suffering. There was sufficient evidence to convict Kingsley of torture.

## III. SENTENCING

### A. UPWARD DEPARTURE SENTENCE

Kingsley submits that the trial court's upward sentencing departure was unreasonable and violated the principle of proportionality, and that the trial court did not provide an adequate explanation for its departure. We disagree.

This Court reviews a departure from the sentencing guidelines range for reasonableness, *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015), determining "whether the trial court abused its discretion by violating the principle of proportionality. . . ." *People v Steanhouse*, 500 Mich 453, 477; 902 NW2d 327 (2017). An abuse of discretion occurs when "the trial court's decision was outside the range of reasonable and principled outcomes." *People v Norfleet*, 317 Mich App 649, 654; 897 NW2d 195 (2016).

In *Lockridge*, 498 Mich 364-365, our Supreme Court held that the sentencing guidelines were advisory rather than mandatory, struck down the requirement that sentencing courts provide a substantial and compelling reason in support of a sentence that departs from the applicable guidelines range, and held that departure sentences would be reviewed on appeal for reasonableness. "[T]he proper inquiry when reviewing a sentence for reasonableness, is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Steanhouse*, 500 Mich at 459-460.

> [D]epartures are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing . . . . [T]rial judges may continue to depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime. [*Milbourn*, 435 Mich at 657.]

"Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality." *Id*. at 660. There are several factors for a trial court to consider under the principle of proportionality, including:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lampe*, 327 Mich App 104, 126; 933 NW2d 314 (2019) (citation omitted).]

If a trial court chooses to depart from the sentencing guidelines, it is required to justify the departure on the record "explaining why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *People v Odom*, 327 Mich App 297, 315; 933 NW2d 719 (2019) (citation and quotation marks omitted).

Kingsley's total offense variable ("OV") score was 195 and his total prior record variable score was 27. This placed Kingsley in the D-VI cell of the Class A sentencing grid, which recommends a minimum sentence of 171 to 285 months' imprisonment. MCL 777.62. However, the trial court went above the recommended minimum sentence range when it sentenced Kingsley to 30 to 60 years' imprisonment on his carjacking, kidnapping, armed robbery, torture, and CSC-I convictions. In support of the upward departures, the trial court stated that it "pored over" the presentence investigation report ("PSIR"), the sentencing guidelines, and the prosecutor's sentencing memorandum, and recalled the facts and testimony at trial. The trial court considered not only Kingsley's actions against the victim in this case, but also his actions against MV, who was similarly sexually assaulted by Kingsley in a wooded area just three weeks before the assault of this victim. The trial court thought that it was "apparent" that Kingsley was on his "way to becoming a serial rapist." Furthermore, the trial court considered that what the victim went through was "every woman's nightmare" and that Kingsley's lack of remorse and acknowledgment, despite the evidence at trial, was concerning.

Additionally, the trial court noted that although Kingsley's OVs for his carjacking, armed robbery, kidnapping, and torture convictions "level[ed] out at 195 points," they were "capped at 100 points." And regarding Kingsley's CSC convictions, the trial court noted that although his total OV score was reduced by 50 points "because OV 11 can't be scored," his total OV score for those convictions was "still well above the 100 points." Moreover, the trial court stated it could not contemplate sentencing Kingsley at the bottom of the sentencing guidelines range and, instead, found that there were "compelling and substantial reasons to go above guidelines," which, the trial court pointed out, "are only advisory." The trial court noted that even if it "went one grid further down, where the top of the guidelines would be 375 months, which is 31 years and 3 months, because those OVs are so much higher than what they get capped off at," it believed that sentencing Kingsley to 30 to 60 years' imprisonment on the carjacking conviction was "a proportionate sentence." After noting the carjacking sentence would be preceding and consecutive to the sentence for Kingsley's first CSC-I conviction, the trial court sentenced Kingsley to 30 to 60 years' imprisonment for the first CSC-I conviction, 30 to 60 years' imprisonment for the other CSC-I conviction, and 30 to 60 years' imprisonment for the armed robbery, kidnapping, and torture convictions.

On appeal, Kingsley asserts that the trial court's reliance on the seriousness of the offenses in justifying the upward departure was inappropriate because the seriousness of the offenses was fully contemplated by the sentencing guidelines. Kingsley submits that the OVs were scored to address the seriousness of the offense, including OV 4, which considers serious psychological injury, OV 7, which considers aggravated physical abuse, and OV 10, which considers exploitation of a vulnerable victim. Moreover, Kingsley noted that OVs 1 and 2 were assessed points for the use of a weapon, and OV 8 was assessed points for asportation or captivity.

Kingsley declined to speak at sentencing, and defense counsel argued that Kingsley had the potential to be a better person upon his release from prison and that consecutive sentencing would not be proportionate. Nonetheless, the trial court found the 30- to 60-year sentences to be proportionate to the offense and offender. In doing so, the trial court explained that the guidelines did not adequately reflect the seriousness of Kingsley's crimes and behavior, emphasizing his commission of a similar crime weeks earlier, the contents of the PSIR, the sentencing memorandum, and the testimony at trial.

It has long been recognized that a "trial court is not required to use any formulaic or 'magic' words" to justify a departure in sentencing. *People v Babcock*, 469 Mich 247, 259 n 13; 666 NW2d 231 (2003). We conclude that the trial court explained the reasons for imposing the upward departure sentence and why the sentence imposed was more proportionate to the offense and offender than a different sentence would have been. See *Odom*, 327 Mich App at 315. As a result, the trial court adequately explained its decision to impose an upward departure sentence. Additionally, the trial court's statements adequately explained its reasoning for the *extent* of the departure sentence imposed. See *Milbourn*, 435 Mich at 659 (explaining that the extent of a departure sentence can violate the principle of proportionality). Therefore, the trial court did not abuse its discretion in imposing an upward departure sentence.

## B. CONSECUTIVE SENTENCES

Kingsley also contends that the trial court erred when it imposed consecutive sentences without articulating its justification for doing so.[5] We agree.

"The purpose of consecutive sentencing is to '*enhance* the punishment imposed upon those who have been found guilty of more serious crimes and who repeatedly engage in criminal acts.' " *People v Chambers*, 430 Mich 217, 229; 421 NW2d 903 (1988) (citation omitted).

> The "[i]mposition of a consecutive sentence is strong medicine. It may well be warranted in some cases. But it should be used only after awareness of a sentence already imposed so that the punitive effect of the consecutive sentence is carefully considered at the time of its imposition." [*Chambers*, 430 Mich at 231, quoting *Salley v United States*, 786 F2d 546, 548 (CA 2, 1986).]

"Review of a discretionary decision requires that the trial court set forth the reasons underlying its decision." *Norfleet*, 317 Mich App at 664. "The decision regarding each consecutive sentence is its own discretionary act and must be separately justified on the record." *Id*. at 665. Imposition of more than one consecutive sentence may be justified in an extraordinary case, but the trial court must articulate its rationale to facilitate appellate review. *Id*.

We conclude that the trial failed to adequately articulate its rationale for imposing three consecutive sentences. As previously noted, the trial court exceeded the recommended minimum sentence range and properly identified its reasons for doing so. The horrific nature of Kingsley's crimes certainly warranted it. But the trial court was also required to articulate its rationale for imposing a consecutive sentence, and to provide a separate justification for each of the three consecutive sentences imposed. See *Norfleet*, 317 Mich App at 666. This was not done. Instead, the trial court's only explanation concerning its imposition of three consecutive sentences was:

> That sentence [carjacking] will be served consecutive to and preceding the sentence on Count 5, criminal sexual conduct in the first degree. And on that charge, you will receive another sentence of 30 years to 60 years. And on that, they're stacked.

---

[5] Kingsley does not take issue with the trial court's statutory authority to impose the consecutive sentences, and therefore, we do not address it.

And that will be served consecutive to and preceding the sentence on Count 6 for criminal sexual conduct in the first degree, where you'll receive another 30 years to 60 years in the Michigan Department of Corrections.

The sentencing recitation is not an articulation of the trial court's rationale underlying each of the three consecutive sentences imposed. This Court is therefore left to speculate concerning the trial court's rationale, which impairs our ability to evaluate whether the trial court abused its discretion. *Id*. at 664-665. Accordingly, we remand to the trial court so that the court can comply with *Norfleet* and fully articulate its rationale underlying the imposition of each consecutive sentence, or for resentencing if the court determines on remand that one or more of the consecutive sentences is not warranted.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Thomas C. Cameron